UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| JEFFERY GORMAN, | ) |
| | ) |
| Petitioner | ) |
| v. | ) |
| | ) Civil No. 05-129-B-W |
| JEFFERY MERRIL, WARDEN, | ) |
| MAINE STATE PRISON, | ) |
| | ) |
| Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 MOTION**

Jeffrey Gorman has filed a 28 U.S.C. § 2254 petition seeking federal relief from his conviction by the State of Maine for the murder of Amy St. Laurent. Gorham presses a single federal habeas ground. He claims that his conviction was obtained in violation of his Sixth Amendment right to confrontation in that his mother's grand jury testimony was admitted at his trial after his mother testified at trial that she had no recollection of Gorman's confession of murder to her <u>and</u> no memory of her testimony to the grand jury relaying the contents of this confession. As he did in his direct appeal to the Supreme Judicial Court of Maine sitting as the Law Court, Gorman relies on <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), a case that issued after his January 2003 trial. The state has filed a response requesting that Gorman's petition be denied and I do recommend that the Court deny the writ.

*Discussion*

Although the gestalt of the Confrontation Clause law in the wake of Crawford is interesting,[1] this petition is relatively easy to resolve because of the care that the Maine Law Court took in weighing Gorman's Crawford claim on his direct appeal.[2]

This court reviews the decision of the Law Court through the following prism:

"The Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA') prevents a federal court from granting an application for writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. The "contrary to" category "embraces cases in which a state court decision directly contravenes Supreme Court precedent." Mastracchio v. Vose, 274 F.3d 590, 597 (1st Cir.2001) (citation omitted). The "unreasonable application category" includes cases in which the state court's decisions, while not "contrary to" relevant Supreme Court precedent, nonetheless constitute an "unreasonable application" of that precedent. Id.
    The Supreme Court has said that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially undistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The "unreasonable application" analysis, however, affords relief only if "the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." Id. at 413.

Knight v. Spencer, 447 F.3d 6, 11 -12 (1st Cir. 2006).

With respect to setting forth the context for the Confrontation Clause dispute the Law Court, in ruling on Gorman's direct appeal, explained:

> St. Laurent's body was found on December 8, 2001, buried in a wooded area three-tenths of a mile from Gorman's mother's house near the pond where Gorman had fished. The cause of death, not disclosed until

---

[1] For instance his case does not raise the question of the retroactivity of Crawford.  See Horton v. Allen  370 F.3d 75, 83 (1st Cir. 2004); see also Lave v. Dretke, 444 F.3d 333 (5th Cir. 2006); Bockting v. Bayer, 399 F.3d 1010 (9th Cir. 2005) cert. granted 126 S. Ct. 2017 (May 15, 2006).
[2] See Norton v. Spencer, 351 F.3d 1, 5 -6 (1st Cir. 2003)

2

March of 2002, was a gunshot wound to the head. There was no evidence, other than the position of her clothing, of sexual assault. The body had been exposed for at least twelve to twenty-four hours before it was buried.

The police received information that Gorman had admitted to his mother that he had shot St. Laurent near the pond. Gorman's mother was then subpoenaed to appear before a grand jury.

After first refusing to testify and then being ordered by a judge to do so, Gorman's mother testified at the grand jury proceedings on February 8, 2002. Discussing her reluctance to testify, Gorman's mother told the grand jury: "I've always wanted to tell the truth. I just never wanted to talk. I just wanted the justice system to do their job and let justice be served and leave me out of it. Because I certainly don't want to testify in any trial."

Addressing her conversation with Gorman, his mother testified under oath that Gorman had called her cell phone on December 9, 2001, the day after St. Laurent's body was discovered. She further testified that during that phone call, Gorman first told her that two other men had killed St. Laurent and buried the body near her house in order to implicate him. He then changed his story, and told her that he had killed St. Laurent. Gorman's mother further testified that Gorman said he had taken four hits of acid that night; that while he and St. Laurent were walking by the pond, he had looked at St. Laurent, seen his mother's face, pulled out a gun and shot St. Laurent in the head, intending to kill his mother. He told his mother that he returned three days later and buried the body with a shovel he had borrowed from her.

Gorman was indicted and pleaded not guilty. His jury trial began in Superior Court on January 13, 2003. That same day, Gorman's mother filed a motion to quash the State's subpoena for her to testify and a supporting affidavit claiming a complete lack of memory of Gorman's confession or her grand jury testimony. After voir dire on the issue of competency and careful consideration of the issue with counsel, the trial court denied the motion to quash.

When Gorman's mother took the stand, she testified about conversations she had with Gorman both before and after December 8-9, 2001, including a conversation on December 10 or 11 that resulted in her sending him money. She also testified that before discovery of the body, Gorman had told her that after a party that "never really developed" he had dropped St. Laurent off at a Portland nightclub, and she testified that Gorman had never changed this version of his actions on the night that St. Laurent disappeared.

Gorman's mother also testified about her recollection of police interviews with her before discovery of the body, about events on December 8 when the body was discovered and about her medical condition at the time of the grand jury proceedings. While recalling and testifying about events on December 8 and December 10, Gorman's mother testified that she had no recollection of her son's December 9

> conversation with her or of the grand jury proceedings. The State repeatedly attempted to refresh her recollection, without success, with both the transcript and the audiotape of the grand jury testimony. During this examination, the State asked: "If you testified before the Grand Jury under oath on February 8, 2002 and you took an oath did you testify to the truth?" Gorman's mother responded: "Absolutely."
>
> Thereafter, the court reporter who had been present at the grand jury testified to lay the foundation for admission of the grand jury testimony. The court reporter identified Gorman's mother as having given testimony on February 8, 2002; he testified that he took down her testimony with his transcription machine and he tape-recorded her testimony. He then transcribed the testimony from his stenographic notes and compared it with the tape-recorded testimony. He testified that the transcript and the audiotape were accurate representations of her testimony that day. He further testified that he observed Gorman's mother being administered the oath to tell the truth and being reminded that she remained under oath on February 8, 2002. Both the audiotape and stenographic notes reflect that she was given that oath.
>
> After hearing each side fully and over Gorman's objection, the trial court admitted the grand jury testimony pursuant to the past recollection recorded exception to the hearsay rule, M.R. Evid. 803(5). Because concerns had been raised about the accuracy of the grand jury transcript, the trial court allowed the State to play for the jury a redacted audiotape of the testimony, rather than read the transcript.
>
> Gorman's mother's testimony took place over defense counsel's objection that she was impaired as a result of overmedication with prescription drugs. Gorman's mother testified that she had a history of delusional behavior and was on psychiatric medications at the time of the phone call, that she was experiencing instances of paranoia and psychosis around that time, and that she had had a tumultuous relationship with her son that included a behavior pattern where they would deliberately say hurtful things to each other that often were not true.

State v. Gorman, 2004 ME 90, ¶¶ 9-18, 854 A.2d 1164, 1168-70 (footnote omitted).

After resolving challenges based on the Maine Rules of Evidence vis-à-vis his mother's testimony, that Law Court addressed the Sixth Amendment concern as follows:

### The Confrontation Clause

> Gorman contends that the admission of his mother's grand jury testimony, even if proper pursuant to M.R. Evid. 803(5), or M.R. Evid. 801(d)(1)(A), violated his right to confront the witness against him under the Sixth Amendment to the United States Constitution and Article I, Section 6 of the Maine Constitution. We have recognized that statements

4

admissible under an exception to the hearsay rule may be inadmissible when tested against the Confrontation Clause of the United States Constitution because Confrontation Clause analysis differs from hearsay rule analysis. See State v. Small, 2003 ME 107, ¶ 22, 830 A.2d 423, 428.

Applying this difference in analysis, the United States Supreme Court recently held that the Confrontation Clause barred admission of a statement that qualified for admission as a statement against penal interest under a Washington State Court rule similar to M.R. Evid. 804(b)(3). Crawford v. Washington, 541 U.S. 36 (2004). The Crawford opinion extensively reviews the history of the Confrontation Clause and its relationship to the hearsay rule. Most significantly, it explicitly overrules Ohio v. Roberts, 448 U.S. 56 (1980), and the analytical framework which Roberts had supplied to address questions of admissibility of hearsay under the Confrontation Clause over the past two decades. Thus, the Court observed:

> Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales. Roberts conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U.S., at 66. This test departs from the historical principles identified above in two respects. First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of ex parte testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that do consist of ex parte testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

Crawford, 124 S.Ct. at 1369.

After discussing some judicial and academic criticism of Roberts, the Court continued:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could

>     be little dissent), but about how reliability can best be determined.
>     Cf. 3 Blackstone, Commentaries, at 373 ("This open examination
>     of witnesses ⋯ is much more conducive to the clearing up of
>     truth"); M. Hale, History and Analysis of the Common Law of
>     England 258 (1713) (adversarial testing "beats and bolts out the
>     Truth much better").
>          The Roberts test allows a jury to hear evidence, untested by
>     the adversary process, based on a mere judicial determination of
>     reliability. It thus replaces the constitutionally prescribed method
>     of assessing reliability with a wholly foreign one.
>
> Id. at 1370.
>          Justice Scalia, writing for the Court, looked to the "original
>     meaning" of the Confrontation Clause in common law practice at the time
>     of adoption of the Bill of Rights. Id. at 1365. "As the English authorities
>     above reveal, the common law in 1791 conditioned admissibility of an
>     absent witness's examination on unavailability and a prior opportunity to
>     cross-examine. The Sixth Amendment therefore incorporates those
>     limitations." Id. at 1365-66.
>          With this history, and conceding some exceptions, Justice Scalia's
>     opinion indicates that the United States Supreme Court's Confrontation
>     Clause jurisprudence has adhered to the following principle: "Testimonial
>     statements of witnesses absent from trial have been admitted only where
>     the declarant is unavailable, and only where the defendant has had prior
>     opportunity to cross-examine." Id. at 1369.

2004 ME 1164, ¶¶ 46-50, 854 A.2d at 1174-76 (footnotes omitted). In a footnote appended to the word "testimonial" in the final paragraph above, the Law Court observed: "Because the statement at issue, made to a police investigator was unequivocally 'testimonial,' like testimony 'before a grand jury, or at a former trial,' the court left the definition of 'testimonial' to another day. Id. at 1374." 2004 ME 1164, ¶ 50 n.6, 854 A.2d at 1176 n.6 (emphasis added). The Law Court continued:

>          For unavailable witnesses, this rule, focusing on prior opportunity
>     for examination, replaces the "firmly rooted" or "particularized guarantees
>     of trustworthiness" tests of Roberts when Confrontation Clause questions
>     arise. While the focus of the opinion was the unavailable witness, the
>     Court also addressed the circumstances when a declarant appears for
>     cross-examination. The Court indicated that such an appearance removes
>     any Confrontation Clause constraint on use of prior statements:
>>          Finally, we reiterate that, when the declarant appears for
>>     cross-examination at trial, the Confrontation Clause places no

>> constraints at all on the use of his prior testimonial statements. See California v. Green, 399 U.S. 149, 162 (1970). It is therefore irrelevant that the reliability of some out-of-court statements "'cannot be replicated, even if the declarant testifies to the same matters in court.'" Post, at [1377], (quoting United States v. Inadi, 475 U.S. 387, 395 (1986)). The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it. (The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See Tennessee v. Street, 471 U.S. 409, 414 (1985).)

Id. at 1369 n. 9.

Gorman contends that his mother was effectively unavailable for cross-examination because, in addition to her lack of memory, she was, during her grand jury testimony, under the influence of psychiatric medications and had a history of delusional thought that demonstrated an inability to separate fact from fantasy to the extent that, according to Gorman, she was not "even minimally competent to be a witness." Essentially, Gorman seeks to reargue the competence question, addressed earlier, as a Confrontation Clause issue. However, a witness is not constitutionally unavailable for purposes of Confrontation Clause analysis when a witness who appears and testifies is impaired, see State v. McKenna, 1998 ME 49, ¶¶ 1-4, 707 A.2d 1309, 1310, or forgetful, see United States v. Owens, 484 U.S. 554, 560 (1988).

Gorman's mother's forgetfulness was particularly selective. She remembered and testified about events on December 8 and a conversation with Gorman on December 10 or 11, but she claimed no memory of a conversation with Gorman on December 9. She remembered and testified about the condition of her health at the time of her grand jury testimony and she testified that if she had testified at the grand jury she "absolutely" would have testified truthfully, but she claimed no memory of the grand jury proceedings. She remembered and testified about some statements Gorman made to her about his encounter with St. Laurent, and she claimed that he had not changed those statements.

In Owens, the United States Supreme Court held that even when a witness has no present memory of a prior out-of-court statement, the right of confrontation is satisfied if the accused has the opportunity to cross-examine the witness at trial:

>> This Court has recognized a partial (and somewhat indeterminate) overlap between the requirements of the traditional hearsay rule and the Confrontation Clause. The dangers associated with hearsay inspired the Court of Appeals in the present case to believe that the Constitution required the testimony to be examined for "indicia of reliability," or "particularized guarantees of trustworthiness." We do not think such an inquiry is called for when a hearsay declarant is present at trial and subject to

7

> > unrestricted cross-examination. In that situation ⋯ the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements. We do not think that a constitutional line drawn by the Confrontation Clause falls between a forgetful witness' live testimony that he once believed this defendant to be the perpetrator of the crime, and the introduction of the witness' earlier statement to that effect.
>
> Id. (internal citations omitted).
>
> Thus, the Crawford Court observed: "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Crawford, 124 S.Ct. at 1369 n. 9. "[I]t is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause [.]" California v. Green, 399 U.S. 149, 157 (1970). Here, the Confrontation Clause was satisfied when Gorman was given the opportunity to examine and cross-examine his mother before the jury regarding what she did and did not recall and the reasons for her failure of recollection. There was no Confrontation Clause violation in admission of the mother's grand jury testimony.

2004 ME 90, ¶¶ 51-55, 854 A.2d 1164, 1176-78 (footnote omitted). "In Green," the Law Court reflected in a footnote to this final paragraph of its confrontation clause discussion,

> the Court upheld the admission at trial of a witness's preliminary hearing testimony occasioned by the witness's failure to remember his earlier inconsistent out-of-court statement. The Court concluded that the truth-seeking purpose of the Confrontation Clause is achieved if the declarant is present and testifying at trial. Regardless of whether the out-of-court statement was made under oath (as it was here), "the witness must now affirm, deny, or qualify the truth of the prior statement under the penalty of perjury ⋯ [and the] jury may be expected to understand and take into account in deciding which, if either, of the statements represents the truth." California v. Green, 399 U.S. 149, 158-59, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

2004 ME 90, ¶55 n.7, 854 A.2d 1164, 1178 n.7.

After the Law Court issued this opinion, Gorman moved for reconsideration and in that motion to the Law Court he argued:

> The Law Court's decision does not address Gorman's central argument that the hearsay declarant's categorical denial of any memory of the subject matter of the testimonial hearsay evidence deprived him of the

8

> opportunity to cross-examine the single-most critical evidence against him. Moreover, the Law Court does not explain how a hearsay declarant with no memory whatsoever of the subject matter can be considered "present at trial to defend or explain [the statement]" *as explicitly required by Crawford.* Finally, the Law Court fails to articulate any principled basis for admitting the same evidence if the declarant invokes a privilege or refuses to testify, or fails to appear at all. In each case, the testimonial hearsay evidence itself remains untested by cross-examination in violation of the Confrontation Clause.

(Mot. Recons. at 2, Docket No. 16, Attach. 1.) This is the portion of Gorman's rebuffed motion for reconsideration to the Law Court[3] that Gorman cites to this court in his argument that the Law Court failed to recognize and address the real contours of his Crawford claim and that, therefore, the deferential standard of review set forth above does not apply to this 28 U.S.C. § 2254 petition.

Given the depth of the Law Court's deliberation apropos Gorman's Crawford-premised Confrontation Clause challenge I am confident, one, that Gorman's argument that the deferential standard of AEDPA review does not apply in this case is errant, and, two, that Gorman is not entitled to 28 U.S.C. § 2254 relief. The state court fully embraced the Crawford analysis and applied it to the particular dimensions of the admission of the grand jury testimony of a reluctant witness professing a lack of memory that was twice put on the stand at the trial and available for cross-examination.[4] Gorman insists that his mother was, despite her presence as a witness at trial, not really available to defend and explain her prior statement. (Pet'r Reply at 4.) The Law Court focused on the parties' ability to confront the witness at trial as to her prior testimony as a basis for its conclusion that there was no Confrontation Clause infirmity; this was not an

---

[3] The United States Supreme Court denied Gorman's petition for review.
[4] In view of the extent to which the Law Court excerpted and then prodded Crawford it would be pointless to spill more ink here on the boundaries of Crawford.

9

unreasonable application of Crawford and the related United States Supreme Court precedents cited by the Law Court.[5]

*Conclusion*

For the reasons above, I recommend that the Court deny Gorman's petition for 28 U.S.C. § 2254 relief.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

December 7, 2006

/s/Margaret J. Kravchuk
U.S. Magistrate Judge

---

[5] Surely it was minimally consistent with the "'facts and circumstances of the case,'" Conner v. McBride, 375 F.3d 643, 649 (7th Cir. 2004) (quoting Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir.1997)), even if erroneous or incorrect, Williams, 529 U.S. at 411.